IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JAMES J. FITZGERALD     )
   Plaintiff       )
            )
v.           )   No. 3:10-1222
            )
MICHAEL J. ASTRUE,     )
   Commissioner of Social Security )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB") as provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) should be GRANTED to the extent that this case should be remanded for further action in accordance with the recommendations contained herein.


## I. INTRODUCTION

The plaintiff protectively filed for DIB on July 23, 2008, alleging an onset date of June 15, 2004, due to degenerative disc disease. (Tr. 97-103, 139.) The plaintiff later added diabetic

retinopathy to his alleged impairments (tr. 171) and amended his onset date to March 1, 2008. (Tr. 22.)  His claim was denied both initially and upon reconsideration, and the plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 50-52, 64.)  ALJ Daniel E. Whitney held a hearing on September 10, 2009 (tr. 19-49), and issued an unfavorable decision on September 18, 2009. (Tr. 12-18.)  On December 7, 2010, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. BACKGROUND

Plaintiff was born on August 15, 1953 (tr. 97), and was fifty-four years old as of March 1, 2008, his amended onset date.  The plaintiff graduated from college in May of 1982. (Tr. 25, 143.) He also served in the military and received a service-connected disability rating of 50%. (Tr. 26, 160, 191.)  The plaintiff has worked as a parole/probation officer, a security officer/guard, and a surveillance systems monitor. (Tr. 26, 29.)

### A. Chronological Background: Procedural Developments and Medical Records

On January 12, 2006, the plaintiff reported to Bell Family Medical Center ("Bell")[1] complaining of pain in his left upper leg and lower back. (Tr. 297.)  He was prescribed Medrol and Vicodin.[2] *Id.*  He went to an initial physical therapy consultation at the Veterans Affairs hospital

_____

[1] The plaintiff's medical care at Bell was under the supervision of Dr. Arikana Chihombori. (Tr. 141, 284-307.)  Although not entirely clear from the record, it appears from the treatment notes that on his visits to Bell, the plaintiff was actually treated by various nurse practitioners. (Tr. 285-302.)

[2] Medrol is a corticosteroid anti-inflammatory, and Vicodin is a narcotic analgesic.  Saunders Pharmaceutical Word Book 433,753 (2009) ("Saunders").

("VA") on August 29, 2006, and reported having back spasms and pain that was a nine out of ten on the pain scale. (Tr. 265-66.) He relayed that his back pain was caused by an injury from lifting a desk while in the military. (Tr. 266.) The physical therapist noted that the plaintiff's chronic low back pain "[a]ppears non-organic in nature" and that the plaintiff demonstrated four out of five Waddell signs.[3] *Id.* The physical therapist prescribed a TENS unit[4] and advised the plaintiff on stretching. *Id.*

On September 6, 2006, the plaintiff returned to Bell with back spasms and was prescribed Medrol, Celebrex, and Flexeril.[2] (Tr. 293.) An X-ray of the plaintiff's spine taken on November 18, 2006, revealed "mild endplate irregularity," "mild disc space narrowing at L4-5," "mild anterior osteophyte formation," and "moderate facet arthrosis." (Tr. 269.)

Dr. Elizabeth Sastre examined the plaintiff at the VA for low back pain and spasms on November 21, 2006, and April 17, 2007. (Tr. 252-53, 256-58.) She reported that the plaintiff had "moderate tenderness to light palpation of the bilateral paraspinal muscles, worse on the right than on the left but no focal spinal tenderness and no CVA tenderness" or joint tenderness. (Tr. 257.) Dr. Sastre diagnosed him with chronic low back pain and prescribed Ibuprofen and methocarbamol.[3] (Tr. 252-254, 257-58.)

---

[3] Waddell signs may indicate whether a patient with low back pain is exaggerating symptoms. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 419-20 (6th Cir. 2008).

[4] Transcutaneous electrical nerve stimulation (TENS) therapy is used to relieve pain through the use of low-voltage electrical current. WebMD, "TENS," http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulation-tens-topic-overview.

[2] Celebrex is a nonsteroidal anti-inflammatory, and Flexeril is a skeletal muscle relaxant. Saunders at 141, 294.

[3] Methocarbamol is a skeletal muscle relaxant. Saunders at 444.

On September 18, 2007, the plaintiff reported to Bell, complaining of back spasms and reporting that when he bent down he could not get back up. (Tr. 290.) The plaintiff declined an MRI at the time, and the medical notes indicate that the plaintiff ambulated without difficulty and had no neuropathy or radiculopathy. *Id.* He was prescribed Oxycodone and Tylenol. *Id.* On November 12, 2007, the plaintiff reported to Dr. Sastre that he was "doing poorly" with his back pain and was having three to four back spasms per week. (Tr. 250.) He indicated that the frequency of spasms and intensity of the pain had increased. *Id.* The plaintiff wore a back brace, and Dr. Sastre noted that he was able to get on the exam table without difficulty. (Tr. 251.) However, according to Dr. Sastre, the plaintiff "jump[ed] off the table with light palpation across bilateral lower lumbar region–but when I listened with the stethoscope over his lumbar area and applied firm pressure there was no tenderness elicited at all." *Id.* As a result, Dr. Sastre believed that the plaintiff's exam was "very unreliable." *Id.* Dr. Sastre was suspicious that he was malingering based upon exam results that were "not supported by his neurologic exam." (Tr. 252.) Due to the plaintiff's claim of worsening pain, however, Dr. Sastre ordered an MRI of his lower back to rule out disease before confronting the plaintiff with her suspicions. *Id.*

An X-ray of the plaintiff's lumbar spine on December 19, 2007, revealed "[m]ild facet hypertrophy at L4-5 and L5-S1 with posterolateral bulge of the disc at the L4-5 level, eccentric on the left with small posterior annular tear of the disc on the left side." (Tr. 268.) On January 16, 2008, the plaintiff presented to Bell with back spasms occurring two to three times per week and lasting for twenty to thirty minutes. (Tr. 289.) He also reported knee pain and symptoms of sleep apnea. *Id.* He was diagnosed with lumbar strain and knee pain with "probable patellar tendinitis" and meniscus

4

tear. *Id.* He was prescribed Motrin[4] and Flexeril, advised to do back stretches, referred for an MRI on his knee, and referred to a sleep clinic. *Id.*

The plaintiff visited Dr. Ashok Saha at the VA pain clinic on January 22, 2008, complaining of back pain that was a nine out of ten on the pain scale. (Tr. 246-49.) He was diagnosed with lumbar degenerative disc disease with facet arthropathy, an annular tear at L4-5 level, and right knee pain. (Tr. 248.) The plaintiff refused a lumbar diskogram. *Id.* He was prescribed Tramadol.[5] (Tr. 249.) The next day, the plaintiff reported to Southern Hills Medical Center for an MRI which revealed "no evidence of fracture" and "no significant abnormality" in his right knee. (Tr. 303-04.)

In March 2008, the plaintiff presented to the VA pain clinic complaining of chronic low back pain and was seen by psychologist Dr. Daniel Kearns. (Tr. 242-46.) The plaintiff reported receiving outpatient psychiatric treatment for depression for four months beginning in 2003. (Tr. 243-44.) He scored a 38 on the Beck Depression Inventory II, indicating symptoms of severe depression, and he had a Global Assessment of Functioning ("GAF") score of 60.[6] (Tr. 244-45.) The plaintiff reported

---

[4] Motrin is a nonsteroidal anti-inflammatory used to treat moderate pain. Saunders at 466.

[5] Tramadol is a "central analgesic for moderate to severe pain." Saunders at 715.

[6] The Beck Depression Inventory II consists of a series of 21 questions "developed to measure the intensity, severity, and depth of depression in patients with psychiatric diagnosis." Encyclopedia of Mental Disorders, "Beck Depression Inventory," at http://www.minddisorders.com/A-Br/Beck-Depression-Inventory.html.

The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass-n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

5

drinking six beers and a half pint of whiskey every two days. (Tr. 243.) Due to his "history of alcohol abuse and ongoing alcohol use," the plaintiff was "considered to be a poor risk for treatment with narcotic pain relievers." (Tr. 245.)

On May 5, 2008, the plaintiff reported to Bell with worsening back spasms. (Tr. 288.) He was prescribed Motrin and Flexeril and instructed to rest and massage his back and wear a back brace. *Id.* The plaintiff returned to Dr. Sastre on July 29, 2008, complaining of spasms, arthritis, and pain in his back, hip, neck, foot, and joints. (Tr. 235-39.) Dr. Sastre reported that the plaintiff was "very well appearing" and in no acute distress but walking stiffly. (Tr. 237.) She noted that the plaintiff's back was "tender everywhere" and that the plaintiff "literally almost jump[ed] off the table" during a physical examination. *Id.* However, Dr. Sastre continued to suspect that the plaintiff was malingering based on inconsistent exam findings, as well as "diffuse tenderness" and positive straight leg tests that were not supported by his neurological exam or MRI findings. (Tr. 238.) As an example, when Dr. Sastre asked the plaintiff to demonstrate his range of motion, "he barely moved his neck more than an inch;" however, when she later spoke to him from behind during the exam "he turned around without difficulty to talk" to her. (Tr. 237.) Dr. Sastre diagnosed the plaintiff with lumbar degenerative disc disease with facet arthropathy, annular tear at L4-5 level, and right knee pain. (Tr. 238.) The plaintiff refused a lumbar diskogram, and Dr. Sastre prescribed Tramadol and recommended physical therapy. *Id.*

On October 16, 2008, Dr. Stephen Burge, a nonexamining consultative physician for Disability Determination Services ("DDS"), completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 195-99.) According to Dr. Burge, the plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds; stand and/or walk about six hours in an eight-hour

6

workday; sit about six hours in an eight-hour workday; and push or pull without limitation. (Tr. 196.)

Dr. Burge noted that the plaintiff complained of lumbar pain, yet imaging studies did not reveal

"focal neuro impingement." *Id.* Additionally, Dr. Burge noted that the plaintiff's "physicians noted

the exam's were unreliable and that he was malingering." *Id.* Dr. Burge concluded that the plaintiff

had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 196-98.)

On November 13, 2008, Dr. Brent Whited performed a "compensation and pension

examination" on the plaintiff at the VA. (Tr. 202-221.) Dr. Whited opined that the plaintiff was able

to stand for 15-30 minutes and was able to walk a quarter mile. (Tr. 203.) He noted that the plaintiff

used a cane and back brace and walked with an antalgic gait. (Tr. 203-04, 212.) Additionally,

Dr. Whited found that the plaintiff demonstrated 5/5 positive Waddell signs, stating[7]:

> [The plaintiff] is very demonstrative and overreacts with even minimal stimulus. I
> have reason to question the validity of my entire examination, as I strongly suspect
> his pain is non-organic. Specifically, I do not trust that my documented range of
> motion readings are truly representative of his actual range of motion, as his
> pain/guarding kept me from assessing the real extent of his excursion.

(Tr. 208.)

Dr. Whited found no objective evidence of a hip or knee condition and believed that the

plaintiff was "exaggerating his symptoms, or if not, [was] guarding due to his chronic pain

condition." (Tr. 210.) Regarding the plaintiff's back pain, Dr. Whited diagnosed him with "mild

---

[7] Dr. Whited listed the five positive Waddell signs to include:

1. Superficial and [w]idespread tenderness or [n]on-anatomic tenderness.
2. Stimulation tests: Axial loading and [p]ain on simulated rotation.
3. Distracted straight leg raise.
4. Non-anatomic sensory changes: [r]egional sensory changes and [r]egional weakness.
5. Overreaction.

(Tr. 208-209.)

7

lumbar spondylosis, with chronic pain syndrome related to back injury." (Tr. 219.) He found "very little radiographic evidence of arthritis," but believed that the plaintiff had "significant and life-altering pain." *Id.* While noting that the plaintiff had "markedly positive Waddell signs" Dr. Whited elaborated that "[c]ertainly his pain is real to him, and is quite debilitating for him." *Id.* Dr. Whited concluded that the plaintiff's degenerative disc disease and radiculopathy of the left lower extremity were "sufficiently disabling" to exclude employment "requiring physical demands and activities." *Id.* However, Dr. Whited also concluded that the plaintiff's ailments and pain did not preclude him from "sedentary employment." *Id.*

On December 9, 2008, the plaintiff presented to Bell complaining of back pain. (Tr. 287.) He was diagnosed with lumbar strain, prescribed Flexeril, and referred for an MRI on his spine and a sleep study. *Id.* The sleep study revealed that the plaintiff had moderate obstructive sleep apnea, and he was prescribed a CPAP unit. (Tr. 316.) The CPAP unit resolved the plaintiff's sleep apnea, and, in April of 2009, the plaintiff was "doing fine" on the CPAP unit. (Tr. 309, 311-12.)

Dr. Reeta Misra, a nonexamining DDS consultative physician, completed an RFC assessment on January 3, 2009. (Tr. 273-281.) Dr. Misra opined that the plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could stand or walk about six hours and sit about six hours in an eight-hour workday; and had no limitations pushing or pulling. (Tr. 274.) Dr. Misra determined that the plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs and could occasionally stoop, kneel, crouch, and crawl. (Tr. 275.) Dr. Misra also found that the plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 276-77.)

8

On March 9 and April 7, 2009, the plaintiff presented to Bell with back, shoulder, and knee pain, and he was seen by certified nurse practitioner Audra Meeks. (Tr. 285-86.) He reported back spasms occurring 2-3 times per week and numbness radiating to his feet. *Id.* Ms. Meeks recommended an MRI on his right knee and prescribed Flexeril and Ibuprofen. (Tr. 285.) Ms. Meeks also ordered a shoulder X-ray and recommended that the plaintiff begin physical therapy, which he declined. *Id.* The plaintiff underwent an MRI on his right knee on March 24, 2009, at Southern Hills Medical Center. (Tr. 282-83.) The MRI revealed a "normal right knee" with "no evidence of fracture, subluxation or other bony or articular abnormality" and "no evidence of knee effusion." (Tr. 283.)

Ms. Meeks prepared a Medical Source Statement on June 11, 2009. (Tr. 322-24.) She listed the plaintiff's impairments as degenerative disc disease, sleep apnea, radiculopathy of the lower extremities, and thoracolumbar spine with arthritis. (Tr. 322.) Ms. Meeks opined that the plaintiff could not work a forty-hour week without missing more than two days per month and that, in a typical eight-hour workday, the plaintiff would be able to sit for a total of two hours for 15-20 minutes at a time; stand for a total of one hour for 20-30 minutes at a time; and walk for a total of one hour for thirty minutes at a time. *Id.* Further, Ms. Meeks opined that the plaintiff could frequently lift 1-5 pounds, occasionally lift 6-10 pounds, and never lift more than ten pounds. *Id.* Ms. Meeks also assessed that the plaintiff could occasionally bend, push, and pull and could frequently use his hands for gross and fine manipulation. (Tr. 323.) Ms. Meeks characterized the plaintiff's pain as moderately severe and found that his abilities to concentrate or focus were adversely affected by his pain, side effects from medication, and fatigue. *Id.* She did not believe that the plaintiff would need to lie down due to his impairments, but she did opine that he would need

9

to occasionally elevate his legs. *Id.* Additionally, Ms. Meeks indicated that the plaintiff would need to take unscheduled breaks every two hours for 10-15 minutes. *Id.* She also found that the plaintiff had environmental limitations to heights, humidity, noise, vibrations, moving machinery, and temperature extremes. (Tr. 324.) As objective support for these findings, Ms. Meeks cited the plaintiff's sleep study as well as her own treatment notes. (Tr. 322, 324.)

### B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and both the plaintiff and Dr. Gordon Doss, a vocational expert ("VE"), testified. (Tr. 19-49.) The plaintiff described his back spasms as "a sharp pain" that feels like "a pin sticking in me." (Tr. 33.) He testified that he "can't bend up" and that he sometimes falls to the floor during a spasm and "can't do anything for about an hour." *Id.* The plaintiff testified that when this happens he must take his medicine and let it "start working before I can do anything." *Id.* The plaintiff wears a back brace, uses a cane, and has trouble with his right knee swelling and "giving out." *Id.* Because of his knee problems, the plaintiff cannot walk up stairs and must "always travel on elevators." *Id.* He testified that it is difficult for him to get out of bed in the morning, especially when he has back spasms, and that he must stay in bed until his medications start working. *Id.*

Although the plaintiff previously attended physical therapy, he was not doing so at the time of the hearing. *Id.* The plaintiff uses a TENS unit, and he listed his current medications as Tramadol, methocarbamol, Motrin, and capsaicin.[8] (Tr. 33-34, 192.) He also described using various massagers, ointments, and creams and acknowledged that his medications help relieve his pain symptoms.

---

[8] Capsaicin is a topical analgesic. Saunders at 128.

10

(Tr. 33-34, 36-37.) According to the plaintiff, side effects of his medications include drowsiness, sweating, fatigue, blurred vision, and nausea. (Tr. 31, 38.)

Describing his prior employment, the plaintiff testified that he worked as a probation officer for fifteen years.[9] (Tr. 26.) In that job, the plaintiff monitored probationers to ensure "that they were under the guidelines of their probation." (Tr. 26.) The plaintiff's job duties included driving to the homes of probationers to perform "curfew checks," administering drug tests, and testifying in court regarding probation violations. (Tr. 26-27.) The plaintiff testified that he carried files "that were sometimes pretty thick" and that he would occasionally need to physically subdue a probationer. (Tr. 27.) The plaintiff testified that he would normally call the police or a coworker for assistance in such cases. *Id.* He retired as a probation officer in February 2008, after his supervisor advised him to do so because he "was not doing the kind of work that [he] was doing before" due to his back and knee problems. (Tr. 31-33.)

After retiring as a probation officer, the plaintiff worked for a few months as a security guard, which required him to walk and check on vehicles. (Tr. 29-32.) He testified that he was unable to perform that job due to his back and knee pain, and, in April 2008, the plaintiff began his current part-time employment as a surveillance security guard at a bank. (Tr. 29-32.) He testified that in this job he sits at an "information desk" and monitors computer screens and gives directions to people entering the bank. (Tr. 29.) The plaintiff works eight-hour shifts two days a week and testified that he is unable to work longer. (Tr. 30, 38.) He has the option of standing or walking if his back starts hurting. (Tr. 30.) The plaintiff indicated that in a typical eight-hour workday, he would stand or walk

---

[9] The ALJ and witnesses used the terms "probation officer" and "parole officer" interchangeably.

11

for two hours and sit for six hours. (Tr. 39.) He estimated that he would stand for 15-20 minutes every thirty minutes. (Tr. 38-39.) The plaintiff relayed that when he had back spasms on the job it was "a bad situation" because he was there alone. (Tr. 30.)

The plaintiff believed that he could only lift 3-4 pounds. (Tr. 39.) He does not shop for groceries, mow the lawn, cook, or do housework. (Tr. 39-40.) He has not traveled out of town in approximately a year and a half because he gets motion sickness and vertigo. (Tr. 39-40.) The plaintiff testified that, if he dropped a quarter on a table, he could pick it up; however, if he dropped it on the floor, it would be too painful to bend down and pick it up. (Tr. 40-41.) The plaintiff lives with his wife and three of his five children. (Tr. 41, 43.) His wife sometimes helps him get in and out of the shower. (Tr. 44.) Although he has a driver's license, at the time of the hearing, the plaintiff had not driven in a year and a half. (Tr. 25.) He testified that either his wife or sister drives him to work. *Id.*

In his spare time, the plaintiff watches TV, reads, lies in bed, and sleeps. (Tr. 44.) The plaintiff testified that he used to attend church and was a member of a veteran's club but that it was too painful for him "to get up and down and then travel and sit." (Tr. 42.) He testified that if he had a family obligation such as a wedding he would be unable to go due to his pain. (Tr. 43.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and classified the plaintiff's past job as a probation and parole officer as light and skilled, as a security guard[10] as light and semiskilled, and as a part-time surveillance systems monitor as sedentary and unskilled. (Tr. 46-47.) The ALJ asked the VE if a hypothetical person with the

---

[10] The VE testified that the plaintiff's job duties fit the description of "security guard" rather than "security officer." (Tr. 46-47.) According to the VE, a "security guard" may also be referred to as a "merchant patroller." (Tr. 47.)

12

plaintiff's age, education, and work history could perform the plaintiff's past work if he could do work at the light level; sit, stand, and walk at will in an eight-hour period; lift twenty pounds occasionally and ten pounds frequently, and not balance. (Tr. 47.) The VE replied that such a person could perform the plaintiff's past work "[i]f the past work would be available with those capabilities." *Id.* The ALJ then asked whether "there are any other jobs that the person could do with those limitations," and the VE replied that "a person would be able to . . . perform a full range of sedentary and light, unskilled jobs and semiskilled jobs if proper training was provided. (Tr. 47-48.) However, the VE testified that, if the plaintiff's testimony were credible, or if the limitations contained in nurse practitioner Meeks' Medical Source Statement were true, then there would be no full-time jobs available to him. (Tr. 48.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on September 18, 2009. (Tr. 12-18.) Based on the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since March 1, 2008, the amended alleged onset date (20 CFR 404.1571 et seq.).

***

3. The claimant has the following severe impairment: degenerative disc disease of the lumbar spine with facet arthropathy (20 CFR 404.1520(c)).

***

13

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

                                    ***

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to work allowing him to sit, stand or walk at will; and which does not require him to balance.

                                    ***

6.    The claimant is capable of performing past relevant work as a probation/parole officer, security officer/guard and surveillance systems monitor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

                                    ***

7.    The claimant has not been under a disability, as determined in the Social Security Act, from March 1, 2008, through the date of this decision (20 CFR 404.1520(1).

(Tr. 14-18.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28

14

L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory

15

diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he

seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc.*

*Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity

is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v.*

*Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the

twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also*

*Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is

one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart*

*v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R.

§§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do

most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or

handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and

remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-

workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R.

§ 404.1521(b). The Commissioner is required to consider the combined effects of impairments that

individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.

§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve

months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled

16

without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert.*

17

*denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The five-step inquiry**

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. (Tr. 18.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date through the date last insured. (Tr. 14.) At step two, the ALJ determined that the plaintiff had the severe impairment of degenerative disc disease of the lumbar spine with facet arthropathy. *Id*. The ALJ also found that the plaintiff had the non-severe impairments of diabetic retinopathy, obstructive sleep apnea, and depression. (Tr. 14-15.) At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet

18

or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 15.) At step four, the ALJ concluded that the plaintiff had the residual functional capacity to perform light work except that such work should allow him to sit, stand, or walk at will and not require him to balance. *Id.* Therefore, the ALJ determined that the plaintiff was capable of performing his past relevant work as a probation/parole officer, security officer/guard, and surveillance systems monitor because these jobs did not require the performance of work-related activities precluded by the plaintiff's residual functional capacity. (Tr. 18.) Because the plaintiff's claim was resolved at step four, the ALJ did not conduct an analysis at step five.

## C. The Plaintiff's Assertions of Error

The plaintiff argues that the ALJ erred by improperly weighing the medical evidence and by improperly relying on the VE's testimony. Docket Entry No. 12-1, at 11-16, 17-19.

### 1. The ALJ properly weighed the medical evidence.

The plaintiff first contends that the ALJ did not give proper weight to the opinions of Dr. Brent Whited or nurse practitioner Audra Meeks. Docket Entry No. 12-1, at 11-16. The plaintiff characterizes Dr. Whited and Ms. Meeks as "treating sources" and argues that the ALJ "essentially ignored" and "totally rejected" their opinions. *Id.*

According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician,

19

psychologist, or other acceptable medical source[11] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[12] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating

---

[11] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

[12] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

20

physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[13] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

---

[13] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

21

### a. Dr. Whited's Opinion

The plaintiff classifies Dr. Whited as a treating source and argues that the ALJ should have given his opinion controlling weight. Docket Entry No. 12-1, at 11-12. Without specifically analyzing the issue, the ALJ described Dr. Whited as a treating source and accorded "some weight" to his opinion. (Tr. 17.) Specifically, the ALJ found that Dr. Whited's opinion that the plaintiff could perform "sedentary work" without "physical demands and activities" was "generally supportive of the conclusion that the [plaintiff] can perform some work with limitations." *Id.* However, the ALJ concluded that a restriction to sedentary work was "more limiting than the record supports." *Id.*

As an initial matter, the Court notes that Dr. Whited is not properly classified as a treating source. Although Dr. Whited is an acceptable medical source, *see* 20 C.F.R. § 404.1513(a), he is not a treating source because he only examined the plaintiff on one occasion–when he performed a compensation and pension examination on November 13, 2008.[14] (Tr. 202-221.) *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502). *See also* 20 C.F.R. 416.903 (defining "treating

---

[14] The plaintiff describes Dr. Whited as his "treating surgeon" (Docket Entry No. 12-1, at 12); however, the plaintiff does not refer to any treatment provided by Dr. Whited, nor does he refer to any surgery whatsoever. The record does not include any indication that Dr. Whited ever treated the plaintiff or that the plaintiff ever had surgery. In fact, after reviewing both the VA and other medical records, Dr. Whited reported that the plaintiff had never had surgery. (Tr. 203, 211.)

source" and noting that the SSA will not consider an acceptable medical source to be a treating source if the relationship "is not based on [the claimant's] need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of a claim for disability"). Because Dr. Whited is not a treating source, the treating physician rule does not apply. *See Smith*, 482 F.3d at 876.

However, even though Dr. Whited is not a treating source and the treating physician rule does not apply, the ALJ still must consider his medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Here, contrary to the plaintiff's assertion, the ALJ did consider Dr. Whited's medical opinion and in fact gave it some credence. In reviewing Dr. Whited's opinion, the ALJ noted Dr. Whited's finding that the plaintiff's knee and hip issues were related to his degenerative disc disease and were not separate conditions. (Tr. 16.) The ALJ also considered Dr. Whited's opinion that the plaintiff was exaggerating his symptoms. *Id.* In the end, the ALJ accorded "some weight" to Dr. Whited's opinion but found that it was more limiting than the record supported. (Tr. 17.) Specifically, the ALJ determined that Dr. Whited's opinion that the plaintiff could perform "sedentary work" was "generally supportive of the conclusion that the claimant can perform some work with limitations."[15] *Id.* Given the ALJ's reasoned discussion of Dr. Whited's opinion, as well as his explanation for the weight given to it, it is clear that the ALJ appropriately considered Dr. Whited's medical opinion as required by the Regulations.

In sum, even though Dr. Whited was not a treating source, the ALJ considered his opinion and afforded it some weight in reaching his final decision. The ALJ agreed with Dr. Whited that the

---

[15] The Commissioner points out that it is not clear whether Dr. Whited's definition of the term "sedentary" is the same definition used in the context of the Social Security Act and Regulations. Docket Entry No 19, at 13.

plaintiff could perform some limited work but found that Dr. Whited's restrictions were not entirely consistent with the medical record. The Court has reviewed the record and concludes that the ALJ's decision in this regard is supported by substantial evidence.

### b. Ms. Meeks' Opinion

The plaintiff also argues that the ALJ erred in rejecting the opinion of nurse practitioner Meeks without offering a specific rationale. Docket Entry No. 12-1, at 13.

In her Medical Source Statement, Ms. Meeks found that the plaintiff suffered from degenerative disc disease, sleep apnea, radiculopathy of the right and left lower extremities, and thoracolumbar spine with arthritis. (Tr. 322.) Ms. Meeks characterized the plaintiff's pain as moderately severe and opined that it affected his ability to concentrate or focus. (Tr. 323.) She estimated that in a typical eight-hour workday, the plaintiff would be able to sit for a total of two hours for 15-20 minutes at a time; stand for a total of one hour for 20-30 minutes at a time; and walk for a total of one hour for thirty minutes at a time. (Tr. 322.) She opined that he would miss more than two days per month and would need to take unscheduled breaks every two hours for 10-15 minutes. (Tr. 322-23.) Further, Ms. Meeks suggested that the plaintiff could frequently lift 1-5 pounds, occasionally lift 6-10 pounds, and never lift more than ten pounds. *Id.* Ms. Meeks also assessed that the plaintiff could occasionally bend, push, and pull and frequently use his hands for gross and fine manipulation. (Tr. 323.) Finally, Ms. Meeks believed that the plaintiff should avoid exposure to heights, humidity, noise, vibrations, moving machinery, and temperature extremes. (Tr. 324.)

24

As the plaintiff concedes in his brief, Ms. Meeks is not an "acceptable medical source."

Docket Entry No. 12-1, at 14. Under the Regulations, nurse practitioners are not classified as

acceptable medical sources but as "other sources."[16] 20 C.F.R. § 404.1513(d). Social Security

Ruling ("SSR") 06-03p has noted that:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540,

at *4 (E.D. Ky. Apr. 12, 2010)). SSR 06-03p clarified the treatment of "other sources" by explaining

that:

> [a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources,"

---

[16] The Regulations define other sources as:

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5. *See also Roberts v. Astrue*, 2009 WL 1651523, at *7-8 (M.D. Tenn.

June 11, 2009) (Wiseman, J.). Finally, SSR 06–03p provides that:

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6 (quoted in *Boran ex rel. S.B. v. Astrue,* 2011 WL 6122953, at *13 (N.D.

Ohio Nov. 22, 2011). *See also Cruse*, 502 F.3d at 541; *Hatfield v. Astrue*, 2008 WL 2437673, at *3

(E.D. Tenn. June 13, 2008) ("The Sixth Circuit, however, appears to interpret the phrase 'should

explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving

the decision whether to explain to the ALJ's discretion.") (quoted in *Boran*, 2011 WL 6122953, at

*13; and *Brandon v. Astrue*, 2010 WL 1444639, at *9 (N.D. Ohio Jan. 27, 2010)).

In this case, the ALJ assigned little weight to Ms. Meeks' Medical Source Statement because,

as a nurse practitioner, her opinion was not entitled to controlling weight and because her opinion

was inconsistent with the record as a whole. (Tr. 17-18.) First, the ALJ was correct in his assertion that Ms. Meeks' opinion was not entitled to controlling weight because she was not a treating source. Second, while the ALJ did not elaborate on the inconsistencies between Ms. Meeks' opinion and the record as a whole, he was not required to do so. These inconsistencies are readily apparent from even a cursory review of the record.

For example, Ms. Meeks cited the plaintiff's sleep study as well as her own treatment notes as objective evidence supporting her opinion.[17] (Tr. 322, 324.) However, the sleep study and accompanying follow up notes indicate that the plaintiff's sleep apnea was resolved months before Ms. Meeks completed her Medical Source Statement. (Tr. 309, 311, 324.) Moreover, the sleep study in no way supports the physical or environmental limitations that Ms. Meeks suggests. Likewise, Ms. Meeks' treatment notes do not support the extensive limitations that she placed on the plaintiff. While Ms. Meeks noted the plaintiff's complaints of back pain, she did not advise him to limit his activity and merely refilled his prescriptions for Flexeril and Ibuprofen. (Tr. 285-86.) And while Ms. Meeks recommended physical therapy, the plaintiff declined to pursue this course of treatment. *Id*. Thus, Ms. Meeks' own treatment notes belie the significant limitations on the plaintiff's functional capacity that she suggests in her Medical Source Statement.

Ms. Meeks' opinion is also inconsistent with the opinions of Drs. Whited and Sastre, who both opined that the plaintiff was malingering. (Tr. 208, 219, 236-39, 250-52.) These opinions were based on physical examinations producing positive Waddell signs and other indications that the

---

[17] The plaintiff asserts that Ms. Meeks treated him for four years. Docket Entry No. 12-1, at 13. However, while the plaintiff was treated at Bell since at least 2006, the only treatment notes signed by Ms. Meeks were from two visits in March and April of 2009. (Tr. 285-86.) All other treatment notes from Bell appear to have been signed by other health care providers. (Tr. 287-302.)

plaintiff was exaggerating his symptoms. The plaintiff's X-rays, which indicated only mild disc impairments, were also inconsistent with the severe limitations found by Ms. Meeks. (Tr. 268-69.)

Finally, Ms. Meeks' opinion is also inconsistent with the assessments of the consultative physicians. In his RFC assessment, Dr. Burge found no postural, manipulative, visual, communicative, or environmental limitations, and he opined that the plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push or pull without limitation. (Tr. 196-98.) Dr. Burge also noted that, while the plaintiff complained of lumbar pain, imaging studies did not reveal "focal neuro impingement," and the plaintiff's physicians suspected him of malingering. *Id.* The ALJ found that Dr. Burge's opinion was "more optimistic than the record supports" but that it nevertheless supported a conclusion that the plaintiff could "perform some work with limitations." (Tr. 17.) Similarly, Dr. Misra found that the plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 276-77.) She opined that the plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could stand or walk about six hours and sit about six hours in an eight-hour workday; and had no limitations pushing or pulling. (Tr. 274.) The ALJ placed "significant weight" on the opinion of Dr. Misra, finding that it was "consistent with the record as a whole."[18] *Id.*

In sum, the ALJ concluded that the opinions of Drs. Misra, Burge, and Whited were a better reflection of the medical record as a whole than the opinion of Ms. Meeks. The ALJ discussed the

---

[18] The ALJ gave less weight to Dr. Misra's opinion that the plaintiff could never climb ladders, ropes, or scaffolds and only occasionally perform other postural activities. (Tr. 17, 275.)

weight he afforded to each doctor's opinion, as well as his reasons for doing so. Accordingly, the Court concludes that the ALJ properly weighed the medical evidence.

## 2. The ALJ improperly relied on the VE's testimony.

The plaintiff next argues that the VE's testimony is flawed because it conflicts with the DOT and is inconsistent with controlling regulations. Docket Entry No. 12-1, at 17.

A VE's testimony is commonly used at step four in the sequential analysis to determine whether a plaintiff is capable of performing his past relevant work. *See Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 548 (6th Cir. 2002). The VE's testimony in response to an ALJ's hypothetical question will be considered substantial evidence only if the hypothetical question "accurately portrays [the plaintiff's] individual physical and mental impairments.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987)). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible." *Id.* (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). It is the plaintiff's burden at step four to prove that he is unable to perform past relevant work or that a particular past job should not be considered relevant. *Cruse,* 502 F.3d at 539; *Jones,* 336 F.3d at 474.

In this case, the VE classified the plaintiff's past work as a probation officer as light and skilled, as a security guard as light and semiskilled, and as a surveillance systems monitor as sedentary and unskilled. (Tr. 47.) The ALJ then asked the VE to consider a hypothetical person sharing the plaintiff's age, education, and work history who was limited to light work; needed to sit,

29

stand, and walk at will; could lift twenty pounds occasionally and ten pounds frequently, and could

not balance. (Tr. 47.) The VE testified that such a person could perform the plaintiff's past work "[i]f

the past work would be available with those capabilities." *Id.* The ALJ then asked whether "there

are any other jobs that the person could do with those limitations," and the VE replied that "a person

would be able to . . . perform a full range of sedentary and light, unskilled jobs and semiskilled jobs

if proper training was provided." (Tr. 47-48.) The VE also testified that, if the plaintiff's testimony

were found to be credible, or if the limitations described in Ms. Meeks' Medical Source Statement

were accepted as true, the plaintiff would be precluded from all work. (Tr. 48.)

  In his decision, the ALJ concluded that the plaintiff had the residual functional capacity to

perform light work except that he was limited to work allowing him to sit, stand, or walk at will and

was precluded from work that required him to balance. (Tr. 15.) Based on the VE's testimony, the

ALJ concluded that the plaintiff "is capable of performing past relevant work as a probation/parole

officer, security officer/guard and surveillance systems monitor." (Tr. 18.) Specifically, the ALJ

concluded that:

> In comparing the claimant's residual functional capacity with the physical and mental
> demands of this work, I find that the claimant is able to perform it as performed in
> the national economy. The vocational expert, despite the limitations found in the
> above residual functional capacity, testified that the claimant could perform his past
> relevant work. He also testified that the claimant could perform a full range of
> sedentary and light unskilled jobs, in addition to semiskilled work at those exertional
> levels if appropriate training was provided.

*Id.*

  The plaintiff argues that the VE's testimony conflicts with the DOT because the VE testified

that the plaintiff could perform work that allows for a sit/stand option, a limitation that is not

specifically addressed in the DOT.[19] Docket Entry No. 12-1, at 18-19. This argument is unavailing because it is well-established that a VE's testimony that an individual can perform work with a sit/stand option does not conflict with the DOT. *See, e.g.*, *Baranich v. Barnhart*, 128 Fed. Appx. 481, 486 n.3 (6th Cir. Apr. 19, 2005) ("[The plaintiff] is therefore incorrect to argue that the ALJ could not include a sit/stand option when such an option is not indicated in the DOT, as the DOT is only one source to be used in assessing the availability of jobs for the claimant."); *Fletcher v. Astrue*, 2011 WL 2222058, at *3 (E.D. Tenn. May 13, 2011) (rejecting the plaintiff's argument that the DOT conflicts with a sit/stand option simply because "the DOT does not address the issue of sit/stand options"); *Manners v. Soc. Sec. Admin.*, 2011 WL 820653, at *8 (M.D. Tenn. Mar. 2, 2011) (Wiseman, J.) ("While the DOT does not recognize any particular job's amenability to a sit/stand option as such, it has been held that no conflict between the testimony of the expert and the DOT is created by the mere imposition of a sit/stand option, such that would require resolution by the ALJ in order to pass muster."). *See also* Report and Recommendations entered in *Rutherford v. Astrue*, 2011 WL 4014431, at *19-20 (M.D. Tenn. Sept. 9, 2011) and *Seay v. Astrue*, 2011 WL 780693, at *11-12 (M.D. Tenn. Feb. 28, 2011), and adopted by the Court. Accordingly, the plaintiff is not entitled to relief on this ground.

The plaintiff also finds fault with the ALJ's conclusion that he could perform his past relevant work. Docket Entry No. 12-1, at 17. The plaintiff first argues, somewhat confusingly, that, had the ALJ accepted Dr. Whited's opinion that the plaintiff was limited to "sedentary" work, his

---

[19] The ALJ satisfied his affirmative duty to ask whether the VE's testimony was consistent with the DOT, and the VE replied that it was. (Tr. 496.) *See Lindsley v. Comm'r of Soc. Sec*, 560 F.3d 601, 606 (6th Cir. 2009) (quoting SSR 00-4p, 2000 WL 1898704, at *4) ("[T]he Social Security Administration imposes an affirmative duty on ALJ's to ask VEs if the evidence that they have provided 'conflicts with the information provided in the DOT.'").

only past sedentary job was as a surveillance systems monitor, which the plaintiff claims does not qualify as past relevant work under the Regulations. *Id.*

The plaintiff's argument is based on the flawed premise that the ALJ accepted Dr. Whited's opinion that the plaintiff was limited to sedentary work. As discussed above, while the ALJ lent some credence to Dr. Whited's opinion, the ALJ did not accept it in full. Rather, the ALJ discounted Dr. Whited's opinion in part and concluded that the plaintiff was capable of light work with certain limitations. In other words, contrary to the plaintiff's hypothetical premise, the ALJ in fact concluded that the plaintiff was *not* limited to sedentary work. Because the ALJ did not accept Dr. Whited's opinion that the plaintiff was limited to sedentary work, the ALJ needed only to identify past relevant work accommodating the limitations that he found applicable, i.e., light work with a sit/stand option and no balancing.

The ALJ concluded that the plaintiff could perform his past relevant work as a probation officer, security guard, and surveillance systems monitor, each being classified as light work or below. (Tr. 18.) The plaintiff finds fault with two aspects of the ALJ's conclusion in this regard. First, the plaintiff argues that the VE's response to the ALJ's hypothetical question was unresponsive and merely begged the question. Docket Entry No. 12-1, at 17-19. Second, the plaintiff contends that his employment as a surveillance systems monitor was not past relevant work because it was part-time and because his earnings for that employment fell below the threshold for substantial gainful employment. Docket Entry No. 20, at 3. The Commissioner does not address the plaintiff's first contention but counters that, even if the plaintiff's job as a surveillance systems monitor did not constitute past relevant work, the ALJ identified two other jobs (i.e., probation officer and security guard) that qualified as past relevant work. Docket Entry No. 19, at 13-15.

32

An ALJ is not required to elicit the testimony of a vocational expert at step four of the sequential analysis. *Cruse*, 502 F.3d at 545; *Parker v. Sec'y of Health & Human Servs.*, 935 F.2d 270, 1991 WL 100547, at *3 (6th Cir. 1991). However, an ALJ may use a vocational expert's testimony at step four to determine whether a plaintiff can do his past relevant work given his RFC. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010); 20 C.F.R. § 404.1560(b)(2) ("We *may* use the services of vocational experts . . . to help us determine whether you can do your past relevant work, given your residual functional capacity.") (Emphasis added). In short, an ALJ is permitted, but not required, to use a vocational expert's testimony at step four.

In this case, the ALJ chose to utilize the VE's expertise in reaching his decision that the plaintiff was capable of performing past relevant work. After the ALJ posed his hypothetical question, he asked, "Can such a person do the claimant's past work," to which the VE responded, "Yes, sir. *If the past work would be available with those capabilities*." (Tr. 47.) (Emphasis added). Later, the ALJ asked, "Are there any other jobs that the person could do with those limitations," and the VE replied that, "[A] person would be able to. . . perform a full range of sedentary and light, unskilled jobs and semiskilled jobs if proper training was provided." (Tr. 47-48.) In his written decision, the ALJ specifically relied on this testimony by the VE to find that the plaintiff could return to his past relevant work. (Tr. 18.)

Upon review of the record, the Court agrees with the plaintiff that the VE's answer that the plaintiff could perform his past jobs "[i]f the past work would be available with those capabilities" is unresponsive to the ALJ's question. As the plaintiff suggests, it merely begs the question. Likewise, the VE's statement that the plaintiff could perform his prior job as a probation officer, which the VE classified as light and skilled, directly conflicts with his later statement that the

33

plaintiff could perform, at most, a full range of light, unskilled and semiskilled jobs. While the ALJ was not obliged to solicit the VE's testimony at step four, he nevertheless did so and, in fact, relied upon that testimony in reaching his conclusion. More importantly, the ALJ apparently misunderstood the VE's testimony. In his decision, the ALJ characterized the VE's testimony as opining that the plaintiff could perform his past relevant work "despite the limitations found" in the RFC. (Tr. 18.) However, the VE's testimony was merely, and confusingly, that the plaintiff could perform his past work if it "would be available with those capabilities." In the Court's view, the ALJ mistakenly relied upon ambiguous testimony by the VE in reaching his step four determination.

Because an ALJ's decision at step four is not dependent on vocational expert testimony, the decision may still stand so long as it is otherwise supported by substantial evidence. *See, e.g., Moots v. Comm'r of Soc. Sec.*, 2012 WL 567653, at *6 (N.D. Ohio Feb. 21, 2012) (finding an ALJ's step four decision to be "sound independent of the VE's testimony"). However, under similar circumstances, other courts have determined that an ALJ's reliance on flawed VE testimony resulted in an administrative decision that was not supported by substantial evidence. *See, e.g., Welch v. Astrue*, 2011 WL 4632922, at *3 (N.D. Ohio Sept. 30, 2011) (finding that substantial evidence did not support the ALJ's decision that the plaintiff was able to perform past relevant work because it was based on VE testimony that was "not clear" and "jumbled"); *D'Angelo v. Comm'r of Soc. Sec.*, 475 F. Supp. 2d 716, 724 (W.D. Mich. Jan. 22, 2007) (finding that ALJ's reliance on VE's "somewhat confusing" step four testimony necessitated remand).

As discussed above, the ALJ determined the plaintiff's RFC based upon the medical record as a whole, and specifically the opinions of Drs. Misra and Burge, and to a lesser degree, Dr. Whited.

34

The Court finds no error with this portion of the ALJ's decision and concludes that the ALJ's RFC assessment is supported by substantial evidence.

The Court is troubled, however, by the ALJ's conclusion that the plaintiff can return to his past relevant work given his RFC. This portion of the ALJ's decision relies exclusively on the VE's testimony– testimony which the ALJ misquotes in his decision. The ALJ's decision does not cite to any other support in the record for the conclusion that the plaintiff can return to his past relevant work. Nor does it contain any comparison of the physical and mental demands of his past work with his RFC. Nor does it contain any support for the ALJ's conclusion that the plaintiff is able to perform this work "as it is performed in the national economy." (Tr. 18.) Finally, the ALJ's decision does not contain any analysis of whether the plaintiff's past jobs even qualify as past relevant work.[20] Given the lack of meaningful analysis in this portion of the ALJ's decision, and given the ALJ's mistaken reliance on the VE's testimony as the sole support for his determination, the Court must conclude that the ALJ's decision at step four is not supported by substantial evidence.

Because the ALJ's step four decision is not supported by substantial evidence, and because the ALJ did not reach step five, the Court recommends that the case be remanded. On remand, the ALJ should determine and make findings as to whether the plaintiff is able to return to his past relevant work in light of the record as a whole, and, if not, whether the plaintiff is disabled at step five of the sequential analysis.

---

[20] The plaintiff argued at the hearing, and in his brief, that his employment as a surveillance security monitor was not past relevant work because it was part-time and his earnings fell below the threshold for substantial gainful employment. (Tr. 24, Docket Entry No. 20, at 3.) The ALJ did not analyze whether that job qualified as past relevant work; however, he concluded that it did "not rise to the level of substantial gainful activity." (Tr. 14.)

## V. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be GRANTED to the extent that the case should be remanded to the ALJ for the ALJ to properly evaluate whether the plaintiff is disabled at step four or step five of the sequential analysis.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully submitted,


JULIET GRIFFIN
United States Magistrate Judge